## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

### PITTSBURGH DIVISION

Brian Perry, individually and on behalf of all
others similarly situated,

Plaintiff,

- against -

Adidas America, Inc.,

Defendant

2:23-cv-959

Class Action Complaint

Jury Trial Demanded

Plaintiff alleges upon information and belief, except for allegations about Plaintiff, which
are based on personal knowledge:

1.      Adidas America, Inc. ("Defendant") manufactures, National Hockey League
("NHL") jerseys represented as "authentic" ("Product").



## I.     BOOMING BUSINESS OF SPORTS MERCHANDISE

2.     Sales of sports merchandise in the United States is close to $20 billion per year.

3.     This generates millions of dollars for teams through royalties and is an increasingly important revenue source.

4.     According to the author of The Fastest Game in the World: Hockey and the Globalization of Sports, "[t]he current popularity of the[se] colorful, oversized shirts is the result of changes in marketing and fan culture, in hockey as well as other sports."[1]

5.     Until relatively recently, "fans went to the arena in everyday street clothes," and "[t]he trend of putting on what the players wore first emerged in European soccer in the 1980s."

6.     Berglund noted that "NHL crowds from the early '90s show that most fans didn't give second thought to what they wore."

7.     However, fans at hockey games, like at the Penguins game shown below, are passionate about wearing their team's jerseys.



---

[1] Bruce Berglund, How Hockey Jerseys Became Standard Wear for Fans, University of California Press Blog, Dec. 18, 2021.

8.      One sociologist explained commitment to a particular sports team "crosses many areas of society such as wealth, position, race, and religion."[2]

9.      The most significant and expensive of such merchandise is the team jersey, often bearing the name of the wearer's favorite player.

10.     The jersey signifies the fan's loyalty to his or his team and provides an opportunity to enhance a relationship with the team.

11.     One apparel executive recognized this fact, stating "We're selling emotion, observed not just a product."[3]

12.     This is supported by relatively low sales for specialty jerseys designed to mark an event or occasion, as opposed to standard jerseys players wear on-ice each night.[4]

13.     National retailer Dick's Sporting Goods identified the three types of hockey jerseys as Authentic, Official, and Replica.[5]

14.     According to Dick's, "[n]ot all jerseys are cut from the same cloth," because "[s]ome might be designed for in-game action, while others are best suited for your gameday party."

15.     By knowing the "differences between authentic and replica jerseys," fans can "match [their] gear to [their] needs."

16.     Hockey jerseys identified as "authentic" "are the on-ice apparel worn by your favorite professional team."

17.     This is consistent with historical usage and understanding, because for decades,

---

[2] Norm O'Reilly, et al., "Merchandise sales rank in professional sport: Purchase drivers and implications for National Hockey League clubs," Sport, Business and Management: An International Journal (2015).
[3] Tim Layden, We are what we wear: How sports jerseys became ubiquitous in the U.S., Sports Illustrated, Feb. 1, 2016.
[4] Keener Jerseys, Jerseys Unite Teams, Fans and Communities.
[5] Authentic vs. Replica Jerseys: What's the Difference?, Pro Tips, Dick's Sporting Goods.

"authentic" in the context of NHL jerseys referred to jerseys worn on the ice by NHL players.

18.    Adidas knows "a replica uniform will not be 'authentic' and, therefore, not desirable to consumers unless it contains all the elements of the uniform worn in competition."

## II.    JERSEYS REPRESENTED AS AUTHENTIC, UNDERSTOOD BY FANS AS WORN "ON ICE"

19.    Consumers purchasing NHL jerseys marketed as "authentic" by the company which makes the jerseys worn by NHL teams will expect they are purchasing jerseys identical to those worn on the ice by NHL players.[6]

20.    On its website, in digital, print, radio and/or television marketing, in-store display marketing and hang tags, Defendant directly or through its agents promotes the jerseys as "The Official Home Game Jersey of The Pittsburgh Penguins."



**THE OFFICIAL HOME GAME JERSEY OF THE PITTSBURGH PENGUINS.**

Put your hands in the air on every goal that Pittsburgh Penguins score. This adidas authentic home jersey features AEROREADY to keep you cool and dry as the Pens' snipers send you to your feet again and again. A mesh underarm insert adds extra breathability when the opposing team tries for a comeback.

This product is made with Primegreen, a series of high-performance recycled materials.

21.    It describes its "adidas authentic home jersey [which] features AEROREADY to keep you cool and dry as the Pens' snipers send you to your feet again and again [with] A mesh underarm insert adds extra breathability when the opposing team tries for a comeback."

---

[6] AJ Strong, Stop Calling Adidas NHL Jerseys Authentic, Teal Town USA, June 29, 2021.

22.    When the jerseys are sold in retail stores, like the official Penguins PensGear store at PPG Arena, they are described as "Authentic Apparel," at Defendant's directive.





23.    The hang tags affixed to the jerseys confirm to purchasers they are worn by Penguins players, designated with the code "Auth" and described as part of the "Authentic NHL Jersey Collection."





24.     That these jerseys are "the same as [] players wear" is confirmed to purchasers due to features which would only be relevant in on-ice jerseys.

25.     These include its promotion of "AEROREADY [which] keeps you cool and dry," "[a] mesh underarm insert," "Primegreen, a series of high-performance recycled materials" and their "[l]oose fit."

26.     Most significantly, the jerseys are marketed as having a "tie-down fight strap," the attachment on hockey jerseys which keeps them from being pulled over their heads during the fights which inevitably break out during hockey games.

27.     There is no reason to include a "fight strap" on a jersey that is not meant to be worn on-ice, because this is solely a utilitarian feature relevant to being on skates in a hockey fight.

28.     However, despite the representations as "authentic," the jerseys are not those worn on-ice by NHL players.

29.     First, the fight straps in Defendant's authentic jerseys are lower quality than in the on-ice jerseys worn by the players.

30.     In the on-ice jersey (left), the fight strap contains a double layered reinforced base, while the Authentic (right) is affixed through a single stitched layer.

 

31.     Second, in the on-ice jersey (left), the dimples or small holes are significantly larger, because they were created through the machines which mechanically press the jersey, while those in the Authentic (left) appear added only for aesthetics.

 

32.     This difference is relevant because these small holes allow air to flow through the jersey, an important feature relevant to its on-ice performance.

33.     The smaller dimples in the Adidas authentic jerseys render them less efficient at dealing with moisture and airflow than the on-ice jerseys.

34.     Third, the fabric in the authentic jerseys is half the thickness of the fabric used in the on-ice jerseys worn by NHL players.

35.     Fourth, the stitching used in the authentic jerseys is weaker and less durable than in the on-ice jerseys.

36.     Fifth, the authentic jerseys are "Made in Indonesia" while the on-ice jerseys are "Made in Canada."

37.     By describing the authentic jerseys as "Imported" on its website and other marketing materials, hockey fans will expect this refers to Canada, the birthplace of ice hockey.

38.     As the world leader – and inventor of hockey – Canada has institutional knowledge of all aspects of this winter sport, passed down through generations of craftsmen.

39.     In contrast, the tropical temperature of Indonesia has never been suitable for playing ice hockey.

40.     The authentic jerseys (middle) are closer to counterfeit Adidas NHL jerseys (bottom) than to those worn on the ice by NHL players (top).



41.    The jerseys have more in common with what is commonly described as "replica" or even counterfeit authentic jerseys than those worn by players on the ice during games.

42.    The representation of the Product as "authentic" is misleading, because they are more accurately described as "replicas."

43.    Defendant has been aware that eagle-eyed consumers have discovered the differences between its authentic jerseys and those worn by players on the ice.

44.    First, a website devoted to covering the San Jose Sharks, TealTownUsa.com, published an article by AJ Strong, entitled, "Stop Calling Adidas NHL Jerseys Authentic," in June 2021.

45.    Strong provided detailed facts about why "it's disingenuous and misleading for Adidas to call [the jerseys] 'authentic' or 'authentic pro'" and recommended "Adidas [] call[s] those jerseys what they are… replicas."

46.    "Products marketed legally and manufactured by the firms owning the production rights of the brand using original ingredients, genuine parts, and raw materials have been referred to as authentic market offerings."

47. "Inauthentic products, on the other hand, are fine copies of the authentic ones They may range from compatibles (e.g., IBM compatible battery), imitations (e.g., imitation crab meat), and replicas (e.g., jewelry) to illegal counterfeits."

48. "While authentic refers to something that is not a copy, hence is of undisputed origin, replica refers to an exact copy or replication of original items, such as paintings as well as other products, and resemble the original in terms of appearance and shape."

49. "When it comes to purchasing items be it paintings, apparel and even accessories, it is important to differentiate between the authentic product and the replica as the pricing and quality are different."

50. Strong also notified Adidas that the prices of their "authentic" jerseys were $50 greater than what comparable replica NHL jerseys are sold for.

51. Second, another fan of the San Jose Sharks, the well-known memorabilia and video game blogger known as "Rezrection," expounded on Strong's points about these jerseys.

52. Rezrection posted a video to his YouTube channel entitled, "Do Not Buy Adidas NHL Authentic Hockey Jerseys Before Watching This Video! What You Need To Know!"

53. Over nine minutes, Rezrection isolated numerous ways in which the authentic Adidas NHL jerseys were deficient compared to the on-ice jerseys.

54. Rezrection cautioned his viewers to be careful about paying almost as much for the authentic jerseys as the on-ice jerseys would cost, given what he described as stark differences in quality.

55. Hockey fans at the popular website reddit.com weighed in on the controversy.

56. One commenter posited that "[t]he reason they market the current Indodidas as

'authentic' is because … Fanatics has the contract to sell replicas."[7]

57.   This is why Adidas "slap[s] a fight strap on some incredibly cheap replicas and brand them as 'authentic.'"

58.   However, "If Adidas were to bring the MiC [Made in Canada worn by players] to retail and market it (or even quietly hang one in the team store next to the Indos), the illusion that the current retail jerseys are authentic would be broken in the eyes of the average fan."

59.   The result would be that "Adidas would lose out on sales on the far more lucrative replica 'authentic' market that they currently have cornered."

60.   Another user remarked that:

> It's not just calling them authentic. It's saying stuff like "the official home game jersey" or the fact that in the beginning they were marketed as "on ice" jerseys, which they clearly are not.
>
> To those who don't follow this stuff, they would think they are getting what the players wear and they most definitely are not.

Captured at: 03/18/2023, 07:53 PM
URL: https://www.reddit.com/r/hockeyjerseys/comments/oalx5b/stop_calling_adidas_nhl_jerseys_authentic_teal/

[deleted] · 2 yr. ago

It's not just calling them authentic. It's saying stuff like "the official home game jersey" or the fact that in the beginning they were marketed as "on ice" jerseys, which they clearly are not.

To those who don't follow this stuff, they would think they are getting what the players wear and they most definitely are not.

⬆ 4 ⬇   Share   • • •

61.   Adidas, like most large companies, regularly monitors social media for mentions of

---

[7] Stop Calling Adidas NHL Jerseys Authentic - Teal Town USA, Reddit.com; Indodidas used by poster to refer to Indonesian-made "authentic" jerseys instead of Canadian-made actual authentic jerseys worn by NHL players.

its brand, and was informed, directly or through its agents, of the issues identified by Strong and Rezrection.

62.     Whether the term used is "knock-off, replica, counterfeit, or even the most obvious of terms: fake; it is all referring to the same rising phenomenon of imitated products."

63.     Studies have shown that consumers form their perception of product authenticity via intrinsic cues (product exposures/experiences, actual product quality) and extrinsic cues (explicit messages, inconspicuous cues) provided by manufacturers.

64.     These indicated that based on consumers' authenticity perception, they are willing to pay significantly more money for the real thing.

65.     Moreover, "even though consumers highly valued authentic products, they were mostly unable to distinguish them" from replicas, sometimes referred to as "counterfeit" or "knock-offs."[8]

66.     "Unless a consumer is well informed about the particular characteristics of the authentic product, it is difficult to discern whether a product is real or fake."[9]

67.     "There is also a large market of disguised replica products that are not identified as being either replica or counterfeit."

68.     This can lead to significant consumer confusion since consumers believe they are purchasing authentic products like the jerseys worn by NHL players on the ice.

<u>Jurisdiction and Venue</u>

69.     Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C.

---

[8] Nguyen, Hang, and Kunter Gunasti. "Authenticity is in the eye of the beholder: From changes in attitudes and preferences to placebo effects." ACR North American Advances (2011).
[9] Slocum, Jenny T., and Jess M. Collen. "The evolving threat and enforcement of replica goods." W. New Eng. L. Rev. 33 (2011): 789.

§ 1332(d)(2).

70.     The aggregate amount in controversy exceeds $5 million, including any statutory and punitive damages, exclusive of interest and costs.

71.     Plaintiff is a citizen of Connecticut.

72.     Defendant is a citizen of Oregon.

73.     The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen.

74.     The members of the class Plaintiff seeks to represent are more than 100, because the Adidas authentic jerseys are sold to consumers from its website, third-party retail sporting goods stores and websites, team shops at NHL arenas, and licensed apparel retailers in the States Plaintiff seeks to represent for the past several years.

75.     Venue is in this District with assignment to the Pittsburgh Division because a substantial part of the events or omissions giving rise to these claims occurred in Allegheny County, which was Plaintiff's purchase of the Adidas Authentic Pittsburgh Penguins NHL Jersey at the PensGear store at PPG Arena in Pittsburgh.

Parties

76.     Plaintiff Brian Perry is a citizen of Windsor, Connecticut, Hartford County.

77.     Defendant Adidas America, Inc. is an Oregon corporation with a principal place of business in Portland, Oregon, Multnomah County.

78.     Adidas manufactures jerseys for the National Hockey League.

79.     Consumers know they can trust a sportswear product with Adidas' well-known three stripes to deliver what it promises.

80.     Plaintiff purchased the Adidas authentic NHL Pittsburgh Penguin jersey at the

official team store while attending a Penguins home hockey game within the past two years for roughly two hundred dollars.

81.     Plaintiff believed the Product was authentic, understood as being the same jersey that the Penguins' players wear during hockey games, from the fight strap to the dimples to the stitching and the fit.

82.     Plaintiff relied on the Product's features such as its fight strap, to believe it was the one worn on ice by the players.

83.     Plaintiff read, reviewed, and relied on Defendant's representations that the jerseys were authentic and/or was exposed to its language on the hang tags and internet sites that he was buying the same jersey worn by players "when the puck drops" on the ice.

84.     Plaintiff was aware the jerseys had features such as an "authentic tie-down fight strap with a hook-and-loop and snap closure," which serve no purpose in a jersey not designed and sold for use on the ice by NHL players.

85.     Plaintiff bought the Product because he expected it was authentic, and the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit, because that is what the representations said and implied.

86.     As a result of the false and misleading representations, the Adidas "authentic" jerseys are sold at premium prices, approximately not less than $200, excluding tax and sales.

87.     Plaintiff relied on the words, descriptions, layout, tags, images, and website descriptions on Defendant's site and those of its third-party partners, about its authentic jerseys.

88.     Plaintiff was disappointed because he believed the Product was authentic, understood as being identical to that worn on the ice by NHL players during games, even though it was not the same jersey worn by members of the Pittsburgh Penguins and other NHL players.

89.   Plaintiff bought the Product at or exceeding the above-referenced price.

90.   Plaintiff would not have purchased the Product if he knew the jerseys were not identical to those worn on the ice by NHL players, or would have paid less for them.

91.   Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, features, and/or components, as those worn on the ice by NHL players.

92.   Plaintiff paid more for the Product than he would have had he known the representations and omissions were false and misleading, or would not have purchased it.

93.   The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

94.   Plaintiff intends to, seeks to, and would purchase Adidas authentic jerseys again when he can do so with assurances those jerseys were identical to those worn on the ice by NHL players.

95.   Plaintiff is unable to rely on the labeling of not only Adidas authentic NHL jerseys, but other sports apparel represented as authentic, because he will be unsure of whether those representations are truthful.

96.   If Defendant was compelled to truthfully describe its hockey jerseys as "replicas" and not "authentic," Plaintiff would have more confidence in the promises of other companies selling sportswear described as authentic.

<u>Class Allegations</u>

97.   Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following class:

> **Pennsylvania Class:** All persons in the State of Pennsylvania who purchased the Product during the statutes of limitations for each cause of action alleged.

98.   Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

99.   Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

100.   Plaintiff is an adequate representative because his interests do not conflict with other members.

101.   No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

102.   Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

103.   Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

104.   Plaintiff seeks class-wide injunctive relief because the practices continue.

Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"),
73 Penn. Stat. Ann. §201-1, *et seq.*

105.   Plaintiff incorporates by reference all preceding paragraphs.

106.   Plaintiff purchased the Product believing it was authentic, understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit.

107.   Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Breaches of Express Warranty,</u>
<u>Implied Warranty of Merchantability/Fitness for a Particular Purpose</u>
<u>and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*</u>

108.   The Product was manufactured, identified, marketed, and sold by Defendant and expressly and impliedly warranted to Plaintiff that it was authentic, understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit.

109.   Defendant directly marketed the Product to Plaintiff through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, product descriptions, and targeted digital advertising.

110.   Defendant knew the product attributes that potential customers like Plaintiff were seeking, such as pro-stock, on-ice game-ready hockey jerseys with features like a fight strap, real pressed dimples, stitched logos, names, and numbers, and developed its marketing and labeling to directly meet their needs and desires.

111.   The representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant it was authentic, understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit.

112.   Defendant's representations affirmed and promised that the Product was authentic, understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit.

113.   Defendant described the Product so Plaintiff believed it was authentic, understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit, which became part of the basis of the bargain that it would

17

conform to its affirmations and promises.

114. Defendant had a duty to disclose and/or provide non-deceptive promises, descriptions and marketing of the Product.

115. This duty is based on Defendant's outsized role in the market for NHL jerseys, the official manufacturer of the jerseys worn on the ice by NHL players, and known as a leader in sportswear.

116. Plaintiff recently became aware of Defendant's breach of the Product's warranties.

117. Plaintiff provided or provides notice to Defendant, its agents, representatives, retailers, and their employees that it breached the Product's warranties.

118. Defendant received notice and should have been aware of these issues due to complaints by consumers and third-parties, including regulators and competitors, to its main offices and through online forums.

119. Defendant monitors the internet and social media and was aware of the articles referenced here.

120. Defendant previously described jerseys of the type it sells here as replicas and argued to a court that such jerseys were inferior to authentic jerseys worn by athletes while playing their sport.

121. The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

122. The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container, or label, because it was marketed as if it was authentic, understood as being the same jersey that NHL players wear during

hockey games, from the fight strap to the dimples to the stitching and the fit.

123.  The Product was not merchantable because Defendant had reason to know the particular purpose for which they were bought by Plaintiff, because he expected that it was authentic, understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit, and he relied on its skill and judgment to select or furnish such a suitable product.

<u>Negligent Misrepresentation</u>

124.  Defendant had a duty to truthfully represent the Product, which it breached.

125.  This duty was non-delegable, and based on Defendant's position, holding itself out as having special knowledge and experience in this area, the official manufacturer of NHL jerseys, and known as a leader in sportswear.

126.  Defendant's representations regarding the Product went beyond the specific representations affixed to the jerseys and describing them on its own websites and those of its third-party sellers, as they incorporated its extra-labeling promises and commitments to quality, as the manufacturer of actual on-ice NHL jerseys

127.  These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

128.  Defendant capitalized on the intense connection that fans like Plaintiff have with their favorite hockey team to entice them to buy – and wear – the same jerseys worn by their favorite players during NHL games.

129.  The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

130.  Plaintiff reasonably and justifiably relied on these negligent misrepresentations and

omissions, which served to induce and did induce, his purchase of the Product.

Fraud

131.   Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it was authentic, understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit.

132.   Defendant understands the differences between authentic and replica jerseys, and has stated that "a replica uniform will not be 'authentic' and, therefore, not desirable to consumers unless it contains all the elements of the uniform worn in competition."

133.   Defendant was aware of the distinctions between replica and authentic jerseys due to its history and involvement as a producer of jerseys for the NHL and other athletic leagues.

134.   Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity or deception, through statement and omission, of the representations.

135.   Defendant knew of the issues described here yet did not address them.

136.   Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations, because it was made from different materials, using different methods, which resulted in jerseys of lower quality than those worn on the ice by NHL players.

Unjust Enrichment

137.   Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

   **WHEREFORE**, Plaintiff prays for judgment:

1. Certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3. Awarding monetary, statutory and/or punitive damages and interest;

4. Awarding costs and expenses, including reasonable attorney and expert fees; and

5. Other and further relief as the Court deems just and proper.

Dated:   June 3, 2023

                    Respectfully submitted,

                    /s/ Spencer Sheehan
                    Sheehan & Associates, P.C.
                    60 Cuttermill Rd Ste 412
                    Great Neck NY 11021
                    (516) 268-7080
                    spencer@spencersheehan.com